UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
-------------------------------------------------------------------

**JAMES T. O'HORA**, individually and
on behalf of all other similarly situated
individuals,

                Plaintiffs,

v.

**RELLEVATE CT, INC.,**
**STEWART STOCKDALE,**
**GREG SCHNEIDER,**
**and VICTORIA LOPEZ NEGRETE,**

                Defendants.
-------------------------------------------------------------------

**COMPLAINT**

Civil Action No.:
3:26-cv-570

Plaintiff, James T. O'Hora, by and through his counsel, Milman Labuda Law Group PLLC, sets forth the following allegations as and for its Complaint against Defendants Rellevate CT, Inc., Stewart Stockdale, Greg Schneider, and Victoria Lopez Negrete ("Defendants"):

## NATURE OF THE CLAIMS

1.      This is a Class and Collective Action Complaint brought to obtain declaratory, injunctive, and monetary relief on behalf of a class of individuals who operate(d) as Business Development Directors, and/or equivalent job titles, for Defendants, and who Defendants classify or classified as independent contractors (the "Collective Group"). Plaintiff alleges violations of the Federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*; the Connecticut Minimum Fair Wage Act ("CMFWA"), Conn. Gen. Stat. § 31-58, *et seq.*; and the Connecticut common law of unjust enrichment.

1

**PARTIES**

2.      Plaintiff James T. O'Hora ("O'Hora") is an adult resident and citizen of the State of Connecticut, and maintains domicile in New Canaan, Connecticut.

3.      O'Hora was previously employed by Defendants from 2020 through 2023.

4.      The "Class" is defined as all individuals who were, at any time, employed by Rellevate as business development professionals ("BDPs"), or equivalent job titles, who were considered by Rellevate to be independent contractors but were actually employees performing marketing functions under the express control and direction of, and exclusively for, Rellevate during any period of time from the founding of the company through the present.

5.      The "Connecticut Class" is defined as all individuals who are both members of the Class and also subject to protection under the Connecticut Minimum Fair Wage Act and Connecticut state law.

6.      Defendant Rellevate CT, Inc. ("Rellevate") is a Connecticut "C" corporation with its principal place of business located at 700 Canal Street, First Floor, Stamford, Connecticut 06902.

7.      Defendant Stewart Stockdale ("Stockdale") is the co-founder, Chairman, and Chief Executive Officer of Rellevate.

8.      Stockdale maintains domicile in or around Darien, Connecticut and is a citizen of the State of Connecticut.

9.      Stockdale has direct authority in setting employment and labor policy decisions for Rellevate, and he directly exerted control and authority of all terms and conditions of employment for O'Hora and all other members of the Class and the Connecticut Class.

10.     Defendant Greg Schneider ("Schneider") is the Executive Vice President and Chief Information Officer of Rellevate.

11.     Schneider has direct authority in setting employment and labor policy decisions for Rellevate, and he directly exerted control and authority of all terms and conditions of employment for O'Hora and all other members of the Class and the Connecticut Class.

12.     Defendant Victoria Lopez Negrete ("Lopez Negrete") is the Chief Administrative Officer of Rellevate.  Lopez Negrete has direct authority in setting employment and labor policy decisions for Rellevate, and she directly exerted control and authority of all terms and conditions of employment for O'Hora and all other members of the Class and the Connecticut Class.

## **JURISDICTION AND VENUE**

13.     This Court has jurisdiction over the claims asserted in this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1332(d), the Class Action Fairness Act of 2005.

14.     Upon information and belief, the parties are diverse, and the aggregate amount in controversy exceeds $5,000,000 inclusive of damages, statutory penalty damages, and attorney's fees, pursuant to the Connecticut Minimum Wage Act and common law.

15.     At least one member of the proposed Class is a citizen of a state other than Connecticut.

16.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred within this district.

17.     To the extent that any individual defendants allege they are domiciled outside the State of Connecticut, this Court has personal jurisdiction over each of them pursuant to Connecticut's long-arm statute because their conduct in violating the Connecticut Minimum Wage

Act and Connecticut's common law is tortious, as that term is defined under Connecticut's long arm statute.

**STATEMENT OF FACTS**

18.    Defendant Rellevate was founded in approximately 2018 by Stockdale and Schneider.

19.    Rellevate is a financial technology firm that develops and markets corporate payroll services, including "pay-any-day" services and digital checking accounts.

20.    To start-up Rellevate, Stockdale and Schneider requested, and received, $1.2 million in state-sponsored startup funding from Connecticut Innovations, a venture capital arm of the government of the State of Connecticut. Upon information and belief, a condition of Rellevate's funding agreement with Connecticut Innovations, pursuant to a Connecticut Presence Agreement, was a requirement for the company to create quality paid employment opportunities within the State of Connecticut.

21.    Rellevate hired numerous marketing professionals located throughout the United States to serve as "business development partners" (BDPs).

22.    Upon information and belief, Rellevate required all BDPs to enter into an agreement assenting to the terms and conditions of its "Business Development Partner Program" (the "BDP Agreement").

23.    The BDP Agreement stated that "Rellevate wishes to build long-term relationships with BDPs based on mutual respect, trust & performance."

24.    The BDP Agreement purported to create an independent contractor relationship between Rellevate and its BPDs, including O'Hora.  However, Defendants knowingly crafted the terms of the BDP Agreement to create an employer-employee relationship instead.

4

25.     For example, the BDP Agreement required that "BDPs will be exclusive to Rellevate – no other similar firm/product may be sold."

26.     Additionally, the BDP Agreement stated that "Rellevate will provide sales training, presentation, collateral and business card template" to BDPs.

27.     Pursuant to the BDP Agreement, Rellevate required BDPs to attend webinar-based training sessions in order to learn how to sell its products to potential customers.

28.     Pursuant to the BDP Agreement, Rellevate provided BDPs with digital collateral to use for marketing purposes, including brochures, slide presentations, and other forms of Rellevate-branded marketing documents.

29.     The BDP Agreement also stated that Rellevate would provide BDPs with a list of target prospect industries for its services.

30.     The BDP Agreement provided instructions to BDPs on how they should identify a prospective customer, how they should pursue that customer, how BDPs should promote Rellevate products during marketing pitches, and how Rellevate expected sales of its services to be made.

31.     Pursuant to the BDP Agreement, Rellevate maintained control over the prospect companies to whom BDPs were permitted to deliver marketing pitches.  Specifically, each BDP was required to identify prospective customers to Rellevate and receive Rellevate's approval before contacting the prospective customer to deliver a marketing pitch.

32.     All BDPs were required to place marketing calls through "HubSpot," a software platform that tracked customer data and made records of all sales-related telephone calls.

33.     Rellevate imposed a minimum quota upon BDPs of at least 100 sales calls per week, made through Hubspot.

34.    If a BDP placed a marketing call through alternative, independent means, and the call was not tracked by Rellevate's Hubspot suite, the call would not count toward that BDP's 100-call weekly quota.

35.    Any BDPs who failed to meet the minimum 100-call weekly quota received warnings or reprimands from Rellevate.

36.    O'Hora personally began working for Rellevate as an employee in mid-2020, and continued as an employee throughout his tenure with the company.

37.    Defendants issued a BDP Agreement to O'Hora dated December 27, 2019.

38.    O'Hora executed his BDP Agreement on or about March 18, 2020.

39.    Upon information and belief, all other members of the Class executed the same or similar BDP Agreement with Rellevate, and were therefore subject to the same terms and conditions.

40.    O'Hora became a business development partner for Rellevate on or about March 18, 2020.

41.    Defendants assigned O'Hora a Rellevate job title of "Director of Business Development."

42.    Defendants assigned O'Hora a Rellevate corporate e-mail address, specifically "johora@rellevate.com"

43.    Defendants provided O'Hora with Rellevate business cards which included his name, corporate e-mail address and job title, and displayed the Rellevate name and corporate logo.

44.    Upon information and belief, the Rellevate business cards issued to O'Hora were identical in appearance to the business cards being issued to company employees, including Rellevate corporate officers, during the same period of time.

45. Defendants expressly requested O'Hora to appear on conference calls with prospective venture capital investors. Defendants instructed O'Hora to deliver presentations about Rellevate and its products during such conference calls.

46. During conference calls with prospective corporate investors, Defendants maintained the appearance that O'Hora was a corporate officer of Rellevate.

47. O'Hora's name and image were depicted on Rellevate's corporate website, under the job title of "Director of Business Development" alongside other individuals and corporate officers employed by Rellevate, including Stockdale, Schneider, and Lopez Negrete.

48. The reason Defendants assigned Director a corporate job title, provided him with Rellevate business cards, provided him with a Rellevate corporate e-mail address, and placed his name and picture on the company's website was expressly to maintain the appearance to customers and other third parties that O'Hora was an officer of the company.

49. As a BDP, Rellevate required O'Hora to conduct at least 100 sales calls per week in a manner dictated by Rellevate, including a requirement that all calls be placed through Rellevate's "HubSpot" software suite.

50. Rellevate also directed O'Hora to personally "network" after regular business hours to source prospective customers. O'Hora did so, pursuant to Rellevate's instructions.

51. Rellevate directed O'Hora to join various local and regional business organizations to source prospective customers, including but not limited to the Connecticut Business and Industry Association, the Eastern Connecticut Chamber of Commerce, the Metro Hartford Alliance, and various Meet Up groups. O'Hora did so, pursuant to Rellevate's instructions.

52. At all times, O'Hora worked tirelessly for Rellevate. His job duties included, but were not limited to: sourcing prospective customers for Rellevate's products; researching potential

customers and their corporate leadership; receiving approval from Rellevate to make sales calls; placing calls to potential customers; engaging in discussions with potential customers to answer their questions about Rellevate's products; preparing responses on behalf of Rellevate to corporate and municipal RFPs; preparing reports and updates for Rellevate's corporate leadership; networking with potential customers; interacting with the corporate lobbying firm Integrated Strategy Group to develop business leads; attending fundraiser/charitable/community events to source potential customers; attending business and trade organization meetings to source potential customers; providing reports in weekly conference calls; participating in conference calls with potential venture capital investors; and numerous other tasks that were assigned by Rellevate.

53. Throughout his time working for Rellevate, between his daytime marketing activities and after-hours networking activities, O'Hora constantly and continuously performed approximately 45-50 hours of work per week for Rellevate.

54. Rellevate did not internally track or record O'Hora's working hours in any way.

55. Initially, after becoming a BDP, O'Hora did not receive any salary or wages from Rellevate.

56. Pursuant to the BDP Agreement, compensation for BDPs was strictly based on commission.

57. Although Rellevate's BDP Agreement established a commission-only compensation structure, BDPs working for the company were not provided with an up-front minimum hourly rate of pay from which commissions could be deducted. Thus, all BDPs worked without the guarantee of a state and/or federal minimum wage.

58.     Despite landing multiple clients and generating revenue for the company, Rellevate never disbursed any commission payments to O'Hora—not one penny—until October 20, 2023, which was after Rellevate had terminated his employment.

59.     From March 2020 through October 2021, O'Hora received absolutely no salary, wages, or commission payments from Rellevate.

60.     Defendants were fully aware that O'Hora was receiving no compensation, but encouraged him to continue working in an unpaid capacity because Rellevate was a "startup."

61.     In October 2021, Rellevate began paying O'Hora a monthly base salary of $3,000.

62.     In November 2021, Rellevate raised O'Hora's monthly base salary to $4,000 per month.

63.     On April 20, 2022, O'Hora executed an "Independent Contractor Agreement" (the "IC Agreement") with Rellevate.

64.     The IC Agreement was written exclusively by Rellevate.

65.     O'Hora was not afforded the opportunity to negotiate the terms of the IC Agreement.

66.     Rellevate instructed O'Hora to sign the IC Agreement if he wished to continue working for the company.

67.     The IC Agreement characterized O'Hora as an "independent contractor."

68.     However, in reality, O'Hora remained an employee of Rellevate, notwithstanding the language in the IC Agreement.

69.     Under the terms of the IC Agreement, Rellevate began paying O'Hora a "base compensation" of $5,000 per month beginning in April 2022.

70. The terms of the IC Agreement also guaranteed commission payments based on a percentage of net revenue generated from clients signed by O'Hora, but no commissions were ever paid to O'Hora pursuant to the IC agreement until October 20, 2023, which was after Rellevate had terminated his employment.

71. During e-mail exchanges in April 2022, Schneider expressly referred to the base compensation specified in the IC Agreement as a "salary."

72. At no time did O'Hora ever issue an invoice to Rellevate for services rendered.

73. O'Hora's monthly base compensation continued until his termination, with the exception of one month in 2023 when Rellevate arbitrarily and unlawfully docked Mr. O'Hora $2,500.

74. The IC Agreement promised that Rellevate corporate stock options would be issued to Mr. O'Hora in the future, as a form of compensation.

75. In fact, Mr. O'Hora was later provided with options to purchase 7,500 shares of Rellevate stock.

76. All of O'Hora's stock options were rescinded when Rellevate terminated his employment in July 2023.

77. The IC Agreement stated that O'Hora "will be reimbursed for any out-of-pocket expenses incurred related to sales activity, with prior approval from Rellevate point of contacts.

78. The IC Agreement stated that any work product information generated by O'Hora in connection with the performance of his job duties, or any resulting intellectual property rights in such information, would be the sole and exclusive property of Rellevate.

79. O'Hora performed work for Rellevate pursuant to the IC Agreement from April 20, 2022 through the termination of his employment in July 2023.

80.     In June 2023, Schneider informed O'Hora by e-mail that he would be responsible for signing at least three new clients every month, or else he would lose his "$5K per month base salary," as Schneider referred to it.

81.     Defendants placed O'Hora on "probation."

82.     Defendants terminated O'Hora's employment on July 17, 2023.

83.     Although Defendants were aware that O'Hora regularly worked 45-50 hours per week, including after-hours networking events and business association meetings, they never directed, authorized, or permitted O'Hora to receive overtime pay.

84.     Subsequent to the termination of his employment, O'Hora made isolated remarks to certain former colleagues that Defendants should have classified him as an employee rather than an independent contractor.  Defendants eventually learned of these isolated remarks.

85.     In response to O'Hora's statements to his former colleagues, Defendants engaged the law firm of Pastore, LLC to issue threats to O'Hora.

86.     Pastore, LLC sent a cease-and-desist letter to O'Hora on August 25, 2023, which stated that O'Hora's "suggestions to third parties that you or others are or were employees, not independent contractors flies in the face of relevant law and is inconsistent with the applicable facts."

87.     Pastore, LLC's August 25, 2023 letter also said that "Rellevate is optimistic that, if your conduct stops immediately, these issues can be resolved amicably without litigation or similar action.  Rellevate operates its business in good faith with every intention of complying with Connecticut or other applicable laws."

88.     O'Hora's conduct did not "stop immediately," as Rellevate had demanded under threat of litigation.

11

89.     Instead, O'Hora later contacted the Connecticut Department of Labor ("CDOL") and shared his opinions about his job classification status with that agency.

90.     After a thorough investigation, the CDOL issued a "Notice of Violation and Opportunity to Show Cause" against Rellevate.

91.     The CDOL determined that Rellevate had violated state law by classifying O'Hora as an independent contractor instead of an employee.  The CDOL issued a civil penalty against Rellevate, and ordered Rellevate to issue certain compensation directly to O'Hora.

92.     Defendants made no attempt to challenge or appeal the CDOL's determination against Rellevate, or the CDOL's civil penalty, or the CDOL's damages award.

## CLASS ALLEGATIONS

93.     This action is brought and may properly proceed as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and Connecticut Practice Book § 9-7.

94.     There are questions of law and fact common to O'Hora and all members of the Class (including the Connecticut Class), which upon information and belief contain at least 40 other BDPs, that predominate over questions affecting only individuals.  Among the questions of law and fact common to the Class are:

  a.     Whether the particular job characteristics of BDPs make them employees of Rellevate or independent contractors, as those terms are respectively interpreted under the FLSA and CMFWA; and

  b.     Whether, if they were misclassified, Rellevate BDPs are entitled to minimum wages or overtime pay due; and

c.     Whether, if they were misclassified, Rellevate was unjustly enriched to the detriment of BDPs by its unlawful avoidance of certain taxes and other expenses for which it would have been responsible if classification had been proper.

95.     The Class for whose benefit this action is brought is so numerous that joinder of all members is impracticable.

96.     Plaintiff O'Hora is a member of the Class who suffered damages as a result of Defendants' conduct and actions alleged herein.

97.     O'Hora's claims against Defendants are typical of the claims of the Class, and he has the same interests as the other members of the Class.

98.     O'Hora does not have interests antagonistic to the interests of the members of the Class.

99.     Within this litigation, O'Hora will fairly and adequately protect the interests of all other Class members and have retained counsel experienced in this type of matter, specifically class action litigation, independent contractor misclassification, and wage & hour litigation.

100.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy and will cause an orderly and expeditious administration of the Class members' claims.

101.     The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications.  Prosecution as a class action will also eliminate the possibility of repetitious litigation.

**COUNT ONE**

**Failure to Pay Minimum Wages and Overtime
to the Plaintiff and Other Members of the Class
in Violation of the FLSA**

102.    O'Hora re-alleges and incorporates by reference every allegation set forth in the preceding Paragraphs.

103.    Section 206 of the FLSA provides in pertinent part: "[e]very employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, [minimum] wages . . . ."

104.    Section 207 of the FLSA provides in pertinent part: "[n]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

105.    There are no FLSA exemptions applicable to O'Hora or any other members of the Class.

106.    Upon information and belief, for the purposes of the FLSA, the Defendants' employment practices were and are uniform in all respects material to the claims asserted in this Complaint throughout the portions of the United States in which Rellevate conducts business.

107.    O'Hora and the other members of the Class were misclassified as "independent contractors," and, as such, were deprived by Defendants of the benefits afforded to them by the

14

FLSA's protections and entitlements, including but not limited to their right to minimum wages and overtime pay.

108.    Upon information and belief, members of the Class were not paid any compensation—neither minimum wages nor commission payments—for some or all of the time they performed work for Rellevate.

109.    Upon information and belief, all members of the Class, either regularly or from time to time, worked more than 40 hours per week, but did not receive overtime pay.

110.    In committing the wrongful acts alleged to be in violation of the FLSA, Defendants acted willfully and knowingly.  Defendants were personally aware of their legal obligations, but knowingly, deliberately, and intentionally failed to pay minimum wages and/or overtime pay.

111.    As a direct and proximate result of Defendants' failure to pay minimum wages and/or overtime, O'Hora and the other members of the Class were damaged in an amount to be proven at trial.

## COUNT TWO

### Failure to Pay Minimum Wages and Overtime
### to the Plaintiff and Other Members of the Connecticut Class
### in Violation of the Connecticut State Law

112.    O'Hora re-alleges and incorporates by reference every allegation set forth in the preceding Paragraphs.

113.    O'Hora and the other members of the Connecticut Class were misclassified by the Defendants as "independent contractors," and, as such, were deprived by Defendants of the benefits afforded to them by the protections and entitlements in the Connecticut Minimum Fair

Wage Act (the "CMFWA"), C.G.S. Section 31-58 et seq., including but not limited to their right to minimum wages and overtime pay.

114. At all relevant times, Defendants have been, and continue to be, an "employer" within the meaning of the CMFWA and thus, the individual Defendants are personally liable.

115. At all relevant times, Defendants have employed, and/or continue to employ, O'Hora and the other members of the Connecticut Class, within the meaning of the CMFWA.

116. Defendants have failed to pay O'Hora and the members of the Connecticut Class the minimum wage to which they are entitled under the CMFWA.

117. Upon information and belief, all members of the Connecticut Class, either regularly or from time to time, worked more than 40 hours per week, but did not receive the overtime pay to which they are entitled under the CMFWA.

118. This claim is brought pursuant to Conn. Gen. Stat. § 31-72, which entitles O'Hora and the other members of the Connecticut Class to recover twice the full amount of such unpaid wages and unpaid overtime, with costs and reasonable attorneys' fees, for violations of the CMFWA.

119. At all relevant times, Defendants have had an established policy and practice of failing and refusing to pay minimum wages and overtime pay to O'Hora and other members of the Connecticut Class, in violation of the CMFWA.

120. Defendants' failure to pay minimum wages and overtime to O'Hora and the other members of the Connecticut Class is willful, knowing, and deliberate.

121. As a result of Defendants' violations of the CMFWA, O'Hora and other members of the Connecticut Class have suffered damages by being denied minimum wage and overtime wages in accordance with the CMFWA in amounts to be proven at trial, and are entitled to recovery

of such amounts, liquidated damages, prejudgment interest, attorney's fees, costs, and other compensation pursuant to the CMFWA.

## COUNT THREE

### Unjust Enrichment

122.    O'Hora re-alleges and incorporates by reference every allegation set forth in the preceding Paragraphs.

123.    By misclassifying O'Hora and other members of the Class as independent contractors when they were actually employees under state and federal law, Defendants were unjustly enriched and/or were conferred a benefit because they unlawfully shifted their business costs and expenses to O'Hora and the other members of the Class, including but not limited to employer payroll taxes, administrative fees, fuel and vehicle maintenance costs, and other costs for which employers are required to pay on behalf of employees, but for which O'Hora and the other members of the Class received no compensation, to their detriment.

124.    Defendants were aware that they received a benefit as a result of the misclassification, and it would be unjust to let Defendants retain the benefit of their unfair savings in business costs and expenses.

**WHEREFORE**, the Plaintiff James T. O'Hora, on behalf of himself and all other members of the Class and the Connecticut Class, respectfully request that the Court issue the following orders:

a.  an order certifying the Class pursuant to Fed. R. Civ. P. 23; and

b.  an order certifying the Connecticut Class pursuant to Connecticut Practice Book § 9-7; and

17

c.  an order certifying the FLSA claims as collective action pursuant to 29 U.S.C. § 216(b).

d.  an order requiring Defendants to pay back wages and overtime pay under the FLSA; and

e.  an order requiring Defendants to pay back wages and overtime under the CMFWA; and

f.  an order requiring Defendants to pay liquidated and/or penalty damages pursuant to C.G.S. Sec. 31-72, as amended by Public Act 15-86; and/or the FLSA; and

g.  and order requiring Defendants to pay reasonable attorney's fees as may be appropriate under Conn. Gen. Stat. § 31-72, as amended by Public Act 15-86 and/or the FLSA; and

h.  an order requiring the Defendants to pay common law punitive damages; and

i.  and order requiring the Defendants to pay interest and costs; and

j.  an order for injunctive relief and declaratory relief to O'Hora and the other members of the Class and the Connecticut Class; and

k.  orders for all other relief that the court deems just and equitable.

O'Hora demands a trial by jury on all counts so triable.

Dated:        Lake Success, New York
              April 10, 2026

**MILMAN LABUDA LAW GROUP PLLC**

By: /s/ Michael C. Mule
        Michael C. Mulè, Esq.
        3000 Marcus Avenue
        Lake Success, New York 11042-1073
        (516) 328-8899 (office)
        (516) 328-0082 (facsimile)
        michaelmule@mllaborlaw.com

        *Counsel for Plaintiff*
        *James T. O'Hora*

18